Christopher H. Dillon
Burke & Parsons
100 Park Avenue
New York NY 10017-5533
(212) 354-3800
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**CHEM ONE LTD.,**

**Plaintiff,**

**- against –**

**M/V RICKMERS GENOA and M/V SUN CROSS, their engines, boilers, etc., *in rem;*
RICKMERS GENOA SCHIFFAHRTSGES mbH & Cie. KG., UNITED SHIPPING
SERVICES, INC., SESCO GROUP INC., CS MARINE CO. LTD., ESM GROUP INC.,
ESM (TIANJIN) CO., LTD.,ESM II, INC., and ESM II LP., *in personam,***

**Defendants.**

_____

**SHANDONG INDUSTRIAL INC.,**

**Plaintiff,**

**- against –**

**M/V RICKMERS GENOA, her engines, boilers, etc.; M/V SUN CROSS, her engines,
boilers, etc.; RICKMERS-LINIE GmbH & CIE. KG; RICKMERS GENOA
SCHIFFAHRTSGES mbH & CIE KG; GENOA NAVIGATION CO. LTD.; CS MARINE
CO., LTD.; SUNWOO MERCHANT MARINE CO. LTD.; ESM GROUP INC., ESM
(TIANJIN) CO., LTD.; PUDONG TRANS USA INC.; and U.S. SHIPPING, INC.**

**Defendants.**

_____

**ST. PAUL TRAVELERS, as *subrogee* of FOREIGN TIRE SALES, INC.**

**Plaintiff,**

**- against –**

**M/V RICKMERS GENOA and MV SUN CROSS, their engines, boilers, tackle, etc.; and
ZEN CONTINENTAL CO., INC., RICKMERS GENOA SCHIFFAHRTSGES GmbH and
CIE. K.G., RICKMERS-LINIE GmbH and CIE. KG and SUNWOO MERCHANT
MARINE CO., LTD.**

**Defendants**

_____

**ATLANTIC COAST YACHT SALES, INC.**

**Plaintiff,**

**vs.**

**M/V RICKMERS GENOA, her engines, boilers, etc., M/V SUN CROSS, her engines,
boilers, etc., RICKMERS-LINIE GmbH & CIE, KG, RICKMERS GENOA
SCHIFFAHRTSGES, mbH & CIE, KG, GENOA NAVIGATION CO. LTD., CS MARINE
CO. LTD., ESM GROUP INC., ESM (TIANJIN) CO., LTD., PUDONG TRANS USA,
INC., and U.S. SHIPPING, INC.**

**Defendants.**

_____

**RICKMERS-LINIE GmbH & Cie. KG; RICKMERS GENOA SCHIFFAHRTSGES mbH &
Cie. KG; and GENOA NAVIGATION CO. LTD.;**

**Third-Party Plaintiffs,**

**- against –**

**ESM GROUP INC.; ESM (TIANJIN) CO., LTD.; PUDONG TRANS USA, INC.; and U.S.
SHIPPING, INC., ESM II, INC., and ESM II LP.**

**Third-Party Defendants**

---

**05 CV 4261 (LAP-THK)**
**05 CV 6226 (LAP-THK)**
**05 CV 8841 (LAP-THK)**
**05 CV 9472 (LAP-THK)**

**MEMORANDUM
IN SUPPORT OF
MOTIONS FOR
SUMMARY
JUDGMENT BY
ESM GROUP INC.
AND ESM
(TIANJIN) CO.,
LTD.**

**Electronically Filed**

## Table of Contents

Table of Contents ..................................................................................................... i

Table of Authorities ................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ..................................................................................................... 1

POINT 1      The Claimants Cannot Establish a Duty to Warn Because They Cannot Show that the Carrier, and the Ship's Master, Could Not Reasonably Have Known About the Cargo's Risks .................................................................................... 2

POINT 2      The Claimants Cannot Prove that There Was a Breach of Any Duty to Warn  8

POINT 3      The Claimants Cannot Prove Proximate Causation ......................................... 9

POINT 4      The Dangerous Cargo Provisions of COGSA §4(6) Should Be Interpreted So They Are Consistent with the Later and More Specific Hazardous Material Transportation Act and the U.S. Dept. of Transportation's Determination that the Cargo is Not Hazardous .............................................................................. 13

POINT 5      The Provisions of COGSA §4(6) Grant No Rights to Cargo Interests ........... 15

POINT 6      The Veil Piercing Claims Alleged Against ESM Group Require Proof of Fraud, or Something Akin to Fraud, Which Is Not Present in this Case ........ 16

POINT 7      The Veil Piercing Claims Alleged Against ESM Group Require Proof of Proximate Cause Which Is Not Present in this Case ...................................... 20

POINT 8      The Agency Theory Claims Alleged Against ESM Group Cannot Create Vicarious Liability Because ESM Tianjin Made Its Sales and Shipment Decisions Independently and Without Control by ESM Group .................... 21

POINT 9      The Rickmers Interests' Indemnity Claims Alleged Against ESM Tianjin Have No Factual or Legal Basis .................................................................... 24

POINT 10     The Economic Loss Rule Bars the Claims By Certain of the Cargo Interests to Recover Additional Freight and Salvage Expenses Attributable to Undamaged Cargo .......................................................................................................... 28

CONCLUSION ..................................................................................................... 35

## Table of Authorities

### Cases

*A/S J. Ludwig Mowinckels Rederi v. Accinanto, Ltd.,*
199 F.2d 134 (4th Cir. 1952) ................................................................... 5, 6

*Aktieselskabet Cuzco* v. *The Sucarseco (The Toluma),*
294 U.S. 394 (1935)................................................................... 30, 31, 32

*Allders Int'l (Ships) Ltd.* v. *United States,*
No. 94 Civ. 5689, 1995 WL 251571 (S.D.N.Y. Apr. 28, 1995)........................................... 30

*Amerada Hess Corp. v. SS Philips Oklahoma,*
558 F. Supp. 1164 (S.D.N.Y. 1983)................................................................... 6, 12

*American Dredging Co. v. Miller,* 510 U.S. 443 (1994) ....................................................... 14

*Amoco Transp. Co. v. S/S Mason Lykes,*
768 F.2d 659 (5th Cir. 1985) ................................................................... 30, 31, 32

*Anderson v. Lorentzen,* 160 F.2d 173 (2d Cir. 1947) ........................................................ 4, 5

*Ashcroft v. Iqbal,* 550 U.S. 544 (2009) ................................................................... 22

*Au Bon Pain Corp. v. Artect, Inc.,*
653 F.2d 61 (2d Cir. 1981)................................................................... 26

*BAII Banking Corp. v. UPG, Inc.,*
985 F.2d 685 (2d Cir. 1993)................................................................... 27

*Bank Line v. Porter,* 25 F.2d 843 (4th Cir. 1928)................................................................... 4

*Barber Lines A/S v. M/V Donau Maru,*
764 F.2d 50 (1st Cir. 1985)................................................................... 29, 33

*Barnum v. Millbrook Care Ltd. P'ship,*
850 F. Supp. 1227 (S.D.N.Y. 1994)................................................................... 27

*Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir. 1998)........................................................ 20

*Bell Petroleum Svcs. Inc. v. Sequa Corp.,*
3 F.3d 889 (5th Cir. 1993) ................................................................... 28

*Benson v. Brower's Moving & Storage, Inc.,*
907 F.2d 310 (2d Cir. 1990)................................................................... 27

*Borgships Inc. v. Olin Chemicals Group,*
No. 96 Civ. 6734, 1997 WL 124127 (S.D.N.Y. March 19, 1997)........................................... 5

*Brandon v. The City of N.Y.,* No. 07 Civ. 8789,
2010 WL 1375207 (S.D.N.Y. March 30, 2010) ................................................................... 22

*Brooks v. Outboard Marine Corp.,*
234 F.3d 89 (2d Cir. 2000)................................................................... 10

*Brown v. Royal Caribbean Cruises, Ltd.,*
Nos. 99 Civ. 2435 & 99 Civ. 11774,
2000 WL 34449703 (S.D.N.Y. Aug. 24, 2000) ................................ 30

*Burke v. Spartanics,* 252 F.3d 131 (2d Cir. 2001) .................................. 10

*Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972) ......................... 12

*Capoziello v. Brasileiro,* 443 F.2d 1155 (2d Cir. 1971) ...................... 27

*Cargill, Inc. v. Doxford & Sunderland Ltd. (Cargill II),*
785 F.2d 1296 (5th Cir. 1986) ..................................................... 31

*Cargill, Inc. v. Doxford & Sunderland, Ltd. (Cargill* I),
782 F.2d 496 (5th Cir. 1986) ........................................................ 32

*Carte Blanche (Singapore) Pte., Ltd. v.*
*Diners Club, Int'l, Inc.,* 2 F.3d 24 (2d Cir. 1993) .................... 20

*Chlorine Institute, Inc. v. California Highway Patrol,*
29 F.3d 495 (9th Cir. 1994) ........................................................ 14

*Conti Corso Schiffahrts-Gmbh & Co. KG NR v.*
*M/V Pinar Kaptanoglu,* 414 F. Supp. 2d 443 (S.D.N.Y. 2006) .......... 30

*Contship Containerlines, Ltd. v. PPG Indus., Inc.,*
 442 F.3d 74 (2d Cir. 2006) ............................................................ 2

*Cook Indus., Inc. v. Barge UM-308,* 622 F.2d 851 (5th Cir. 1980) ....... 11

*Cordius Trust v. Kummerfield,*
No. 04-2722, 153 Fed. Appx. 761 (2d Cir. Oct. 4, 2005) .................... 20

*Cornec v. Baltimore and Ohio RR Co.,*
48 F. 2d 497 (4th Cir. 1931) .................................................... 6, 8

*Corpus Christi Oil & Gas Co. v.*
*Zapata Gulf Marine Corp.,* 71 F.3d 198 (5th Cir. 1995) ................... 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ................................................................... 10

*Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,*
782 F.2d 329 (2d Cir. 1986) ........................................................ 18

*East River S.S. Corp. v. Transamerica Delaval, Inc.,*
476 U.S. 858 (1986) .............................................................. 30, 34

*Edmonds v. Compagnie Generale Transatlantique,*
443 U.S. 256 (1979) ................................................................... 28

*Ente Nazionale Per L'Energia Electtrica,*
774 F.2d 648 (4th Cir. 1985) ...................................................... 10

*Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960) ............... 18, 20

*Fletcher v. Atex, Inc.,* 68 F.3d 1451 (2d Cir. 1995) .......................... 21

iii

*Freeman v. Burlington Broadcasters, Inc.*,
204 F.3d 311 (2d Cir. 2000)................................................................ 14

*Gartner v. Snyder*, 607 F.2d 582 (2d Cir. 1979)............................................. 19, 20

*Gas Natural SDG S.A. v. United States*,
No. 07-2129, 2008 WL 4643944 (2d Cir. Oct. 21, 2008)...................................... 28

*Geddes v. United Fin. Group,*
559 F.2d 557 (9th Cir. 1977) ............................................................ 26

*Georgia Co. v. Richfield Oil Co.*,
50 F.2d 901 (W.D.Wash. 1930)............................................................ 31

*Getty Ref. & Mktg. Co. v. MT Fadi B,*
766 F.2d 829 (3d Cir. 1985)............................................................. 33

*Gordon H. Mooney Ltd. v. Farrell Lines, Inc.*,
616 F.2d 619 (2d Cir. 1980)............................................................. 27

*Hobart v. Sohio Petroleum Co.*,
376 F.2d 1011 (5th Cir. 1967) ............................................................ 6

*Icelandic Coast Guard v. United Techs. Corp.*,
722 F. Supp. 942 (D. Conn. 1989)........................................................ 33

*In re M/V DG Harmony*, 533 F.3d 83 (2d Cir. 2008) .................................... passim

*In re Moran Enters. Corp.,*
77 F. Supp. 2d 334 (E.D.N.Y. 1999) ................................................ 29, 30, 32

*In re Rickmers Genoa Litigation*,
622 F. Supp. 2d 56 (S.D.N.Y. 2009)...................................................... 16

*In re Sokolowki*, 205 F.3d 532 (2d Cir. 2000) ...................................... 17

*Interocean Shipping Co. v.*
*Nat'l Shipping and Trading Corp.*,
523 F.2d 527 (2d Cir. 1975)......................................................... 17, 19

*Ionmar Compania Naviera, S.A. v. Olin Corp.*,
666 F.2d 897 (5th Cir. 1982) ............................................................ 4

*Isbrandtsen Co., Inc. v.*
*United States (the Edmund Fanning)*,
201 F.2d 281 (2d Cir. 1953)............................................................. 6

*Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980)................................. 18, 19

*Krummel v. Bombardier Corp.*,
206 F.3d 548 (5th Cir. 2000) ............................................................ 8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................ 10

*Levatino Co. v. American President Lines, Ltd.*,
337 F.2d 729 (2d Cir. 1964)............................................................. 6

iv

*Louisiana ex rel. Guste* v. *M/V Testbank,*
752 F.2d 1019 (5th Cir. 1985) .................................................................. 29

*Martinez v. Dixie Carriers, Inc.,*
529 F.2d 457 (5th Cir. 1976) ........................................................ 6, 9, 11

*Matsushita Elec. Corp. v. S.S. Aegis Spirit,*
414 F. Supp. 894 (W.D. Wash. 1976)................................................... 26

*Maung Ng We v. Merrill Lynch & Co.,*
No. 99-CV-9687, 2000 WL 1159835
(S.D.N.Y. Aug. 15, 2000) .................................................................... 22

*Mitsui Co. v. Am. Export Lines, Inc.,*
636 F.2d 807 (2d Cir. 1981)................................................................. 26

*Monica Textile Corp. v. S.S. Tana,*
952 F.2d 636 (2d Cir. 1991)................................................................. 26

*Morris v. New York State Dep't of Taxation and Fin.,*
82 N.Y.2d 135, 623 N.E. 2d 1157 (1993).......................................... 20

*N. Tanker (Cyprus) Ltd. v. Backstrom,*
967 F. Supp. 1391 (D. Conn. 1997)..................................................... 16

*Nauru Phosphate Royalties, Inc. v.
Drago Daic Interests, Inc.,*
138 F.3d 160 (5th Cir. 1998) .............................................................. 27

*Navieros Oceanikos, S.A. v.
S.T. Mobil Trader,* 554 F.2d 43 (2d Cir. 1977)................................... 26

*Norfolk Southern Railway Co. v. Kirby,* 543 U. S. 14 (2004) ................ 24

*Ope Shipping, Ltd. v.
Allstate Ins. Co.,* 687 F.2d 639 (2d Cir. 1982)..................................... 17

*Plaza Marine, Inc. v. Exxon Corp.,*
814 F. Supp. 334 (S.D.N.Y. 1993)....................................................... 30

*Project Hope v. M/V IBN SINA,*
250 F.3d 67 (2d Cir. 2001)................................................................... 28

*Raskin v. Wyatt Co.,* 125 F.3d 55 (2d Cir. 1997)................................... 10

*Ravo v. Rogatnick,* 70 N.Y.2d 305,
514 N.E.2d 1104 (1987)....................................................................... 28

*Remington Rand, Inc. v. American Export Lines, Inc.,*
132 F. Supp. 129 (S.D.N.Y. 1955)..................................................... 5, 6

*Robert C. Herd & Co. v. Krawill Machinery Corp.,*
359 U.S. 297 (1959)............................................................................. 16

*Robins Dry Dock & Repair Co. v. Flint,*
275 U.S. 303 (1927)....................................................................... 28, 32

*Royal & Sun Alliance Ins. PLC v.*
*Ocean World Lines, Inc.,*
572 F. Supp. 2d 379 (S.D.N.Y. 2008) .................................................................................. 24

*Schroeder Bros., Inc., v. Saturnia,*
226 F.2d 147 (2d Cir. 1955) ................................................................................................ 11

*Sinram v. Pennsylvania R. Co.,* 61 F. 2d 767 (2d Cir. 1932) ............................................. 16

*Skibs A/S Gylf v. Hyman Michaels Co.,*
438 F.2d 803 (6th Cir. 1971) .................................................................................................. 6

*Somo Japan Ins. Co. of Am. v.*
*Union Pacific R.R. Co.,* 456 F.3d 54 (2d Cir. 2006) ............................................................. 14

*Southern Pac. Co. v. Walker-Smith Co.,*
257 S.W. 347 (Tex. Civ. App. 1923) ....................................................................................... 5

*Tennessee v. U.S. Dept. of Transp.,* 326 F.3d 729 (6th Cir. 2003) ....................................... 15

*The Athanasia Comninos,* [1990] 1 Lloyds. L. Rep. 277 ........................................................ 7

*Thrift Drug, Inc. v.*
*Universal Prescription Administrators,*
131 F.3d 95 (2d Cir. 1997) ................................................................................................... 20

*Tr. of the Plumbers Local Union No. 1 Welfare Fund v.*
*Dan Yant, Inc.,* No. 06 Civ. 173,
2007 WL 3036759 (E.D.N.Y. Oct. 16, 2007) ....................................................................... 26

*Verbeeck v. Black Diamond S.S. Corp.,* 269 F.2d 68 (2d Cir. 1959) ................................ 4, 5

*Westchester Fire Ins. Co. v.*
*Buffalo Housewrecking & Salvage Co.,*
129 F.2d 319 (2d Cir. 1942) ................................................................................................ 15

*Willfaro,* 9 F.2d 940 (N.D.Cal.), *aff'd,* 9 F.2d 622 (9th Cir. 1925) .................................... 4, 6

*William Wrigley Jr. Co. v. Waters,*
890 F.2d 594 (2d Cir. 1989) ................................................................................................ 18

*Williams v. McAllister Bros. Inc.,*
534 F.2d 19 (2d Cir. 1976) .................................................................................................. 19

*Williamson v. Recovery Ltd. P'ship,*
542 F.3d 43 (2d Cir. 2008) ............................................................................................ 16, 18

*Wolf v. Fed. Republic of Germany,* No. 93 Civ. 7499,
1995 WL 263471 (N.D. Ill. May 1, 1995) ........................................................................... 27

## Statutes, Regulations and Rules

Carriage of Goods by Sea Act, Historical Note, 46 U.S.C. §30701 ................................ 13, 14

Federal Rules of Civil Procedure 37(c)(1) ....................................................................... 9

Federal Rules of Civil Procedure 56(b) ........................................................................... 1

Federal Rules of Evidence 702 ........................................................................................ 9

Hazardous Material Regulations, 49 C.F.R. §§171-180 ................................................... 14

Hazardous Materials Transportation Act, 49 U.S.C. §§5101-5127 .................................. 14

Hazardous Materials Transportation Act, 49 U.S.C. §§5125 ........................................... 14

## Other Authorities

*Benedict on Admiralty,* Volume 2A, §92 (March 2000) ................................................... 5

D.B. Dobbs, *The Law of Torts*, §174 (2001) .................................................................. 28

James A. Henderson, Jr. and Aaron D. Twerski,
*Doctrinal Collapse in Products Liability:*
*The Empty Shell of Failure to Warn*, 65 N.Y.U. L. Rev. 265 (1990) ................................... 12

Restatement (Second) of Agency §1 ................................................................................. 21

Restatement (Second) of Agency §27 ............................................................................... 21

Restatement (Second) of Torts §388 ................................................................................ 7

Restatement (Third) of Torts: Products Liability §2 (1998) ............................................. 8

Restatement (Third) of Torts: Products Liability §21 (1998) ........................................... 30

Richard A. Lord, *Williston on Contracts* §37:55 (4th ed. 2000) ..................................... 27

## PRELIMINARY STATEMENT

ESM Group Inc. ("ESM Group") and ESM (Tianjin) Co. Ltd. ("ESM Tianjin"), are defendants, third-party defendants, and counter-claimants in these consolidated maritime actions.  They are the buyers and shippers, respectively, of a cargo of magnesium-based desulfurization reagent, also known by the trade name Super-Sul Mg-89 (the "Cargo").  It is a dry mixture, made principally from ground particles of magnesium (89.5 percent by weight), that is used to remove sulfur from molten iron in steelmaking.  The Cargo was being carried by M/V Rickmers Genoa at the time of her collision, flooding, and the fire/explosions occurring in the Yellow Sea on March 8, 2005 (the "Casualty").

The parties asserting claims against ESM Group and ESM Tianjin, the twenty-four plaintiffs that are the cargo interests (the "Cargo Interests"), and the three companies that own, charter, and operate Rickmers Genoa (the "Rickmers Interests") (collectively the "Claimants"), have the burden of proving the essential elements of their claims.  Now that fact discovery has concluded, the documentary and deposition evidence--along with the expert reports and admissions responses--make it apparent that there are significant deficiencies in the proof required to meet the essential elements of the claims against ESM Group and ESM Tianjin. Accordingly, ESM Group and ESM Tianjin bring this summary judgment motion seeking dismissal of all of the claims asserted against them.  *See,* Fed. R. Civ. P. 56(b).

## BACKGROUND

For about 18 months and 27 voyages prior to the Casualty, the Rickmers Interests regularly (and safely) carried, on similar voyages from China to the United States, magnesium-based cargoes shipped by ESM Tianjin to ESM Group.  56.1 Stmt. ⁋6.  During this time period,

the Rickmers Interests were given 1) a Material Safety Data Sheet (MSDS) warning that magnesium (like many other metals) can burn and liberate hydrogen gas when exposed to water, and requires dry extinguishants and not water for fire-fighting ; 2) U.S. Customs declarations and other information identifying the Cargo, in English, as "magnesium desulfurization reagent;" 3) documents with the Chinese characters representing the Mandarin words, "Mei Tuo Liu Ji," which translate as "magnesium desulfurization reagent;" 4) verbal statements using the Mandarin words, "Mei Tuo Liu Ji," which translate as "magnesium desulfurization reagent;" and 5) the numeric commodity code, 81043000, which identified the Cargo in the Harmonized Tariff System as "magnesium and articles thereof including waste and scrap: raspings, turnings and granules, graded according to size; powders." *Id.* ¶¶ 7-25; 35-59.

All of the claims against ESM Group and ESM Tianjin are premised upon a failure to warn theory.  Such claims require the claimants to establish "the traditional elements of negligence liability," namely: "(1) the defendant had a duty to warn because the cargo presented 'dangers … of which the stevedore and ship's master could not reasonably have been expected to be aware…'; (2) the defendant breached that duty by failing to provide an adequate warning; and (3) the breach in duty caused (4) the resulting harm."  *In re M/V DG Harmony*, 533 F.3d 83, 94 (2d Cir. 2008), quoting *Contship Containerlines, Ltd. v. PPG Indus., Inc.*, 442 F.3d 74, 78 (2d Cir. 2006).

**POINT 1**      **The Claimants Cannot Establish a Duty to Warn Because They Cannot Show that the Carrier, and the Ship's Master, Could Not Reasonably Have Known About the Cargo's Risks**

To establish that "a shipper has a duty to warn," the plaintiffs must be able to show that "the cargo presented dangers about which the carrier could not reasonably be expected to know."

*In re M/V DG Harmony*, 533 F.3d at 94-95 (2d Cir. 2008). While this issue may call for "a fact-sensitive analysis," the question "[w]hether a cargo posed 'dangers of which the [carrier] could not reasonably have been expected to be aware,' is principally a legal question that hinges on a legal judgment about what the carrier reasonably should have known." *Id.* The Second Circuit has also indicated that a duty to warn may also be limited to situations where the Cargo presented "dangers … of which the stevedore and ship's master could not reasonably have been expected to be aware." *Id.* Ultimately, the "existence of this duty is … a question of law." *Id.*

In this case, the resolution of the duty issue depends largely upon the knowledge and constructive knowledge of the Rickmers Interests. They had an eighteen month history of regularly booking and transporting over twenty-five shipments of this Cargo, and were (or should have been) "knowledgeable" about the nature and characteristics of the Cargo. [1] With regard to the ship's master, it is clear from his deposition testimony that Capt. Bielawski had background knowledge about the hydrogen gas generation risks of a magnesium-based cargo. 56.1 Stmt. ¶60. Moreover, a simple search on the Chinese language Wikipedia website by the representatives for the Rickmers Interests in China would have informed them of the very risk

---

[1] Because of its magnesium content, the Cargo has certain risks, i.e., hydrogen gas generation when wet and a requirement for dry extinguishants, rather than water, for fire-fighting. 56.1 Stmt. ¶89-93. Though the Rickmers Interests have suggestively claimed that the MSDS for the Cargo refers to unusual fire and explosion risks, this is misleading. The MSDS has a sub-section entitled "Unusual fire and explosion risks," but it does not identify any risks that are peculiar to the Cargo. Rather, the risks mentioned are clearly labeled as generic to "magnesium fire(s)" and directly related to fire-fighting, i.e., they do not arise until after a fire has started. Specifically, the relevant sub-section in the MSDS reads as follows: "Unusual Fire and Explosion Hazards: Direct viewing of magnesium fires may result in eye injury. Use of water on a magnesium fire will generate hydrogen gas that may cause an explosion." 56.1 Stmt. ¶91.

3

which they claim has been implicated by the Casualty, i.e., that magnesium, when exposed to water, can generate hydrogen gas.  *See*, McCarthy Affidavit at ¶7.

## A. The Carrier's obligation to care for cargo includes the task of ascertaining its characteristics and frailties

The Second Circuit has explicitly charged carriers "with whatever knowledge they would have acquired as to the nature and characteristics of cargo carried on their ship *by the exercise of reasonable care to acquaint themselves with the facts*," or "upon what they should have known about it as well as upon what they did know."  *Anderson v. Lorentzen*, 160 F.2d 173, 175 (2d Cir. 1947) (emphasis added).  There, the court held that a carrier's responsibility for a cashew nut oil cargo included knowing about its corrosive nature and the carrier was required to "take reasonable precautions in the light of such knowledge to protect the cargo."  *Id.  See also*, *Verbeeck v. Black Diamond S.S. Corp.*, 269 F.2d 68, 70 (2d Cir. 1959) ("When the carrier determined to accept this inflammable [naphthalene] cargo, it then accepted the obligation to carry it safely.").  Other courts of appeal have similarly imposed upon shipowners the "duty of *using due care to ascertain and consider the nature and characteristics* of goods offered for shipment," *Bank Line v. Porter*, 25 F.2d 843, 845 (4th Cir. 1928) (emphasis added); *The Willfaro*, 9 F.2d 940, 942 (N.D.Cal.), *aff'd*, 9 F.2d 622 (9th Cir. 1925) ("The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including the adoption of such methods as their nature require."); *Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (5th Cir. 1982) (charging carriers with what they "should have known").

Decisions in the Southern District have also expressly held that, in the absence of actual knowledge, a carrier is "under an obligation to seek it." *Remington Rand, Inc. v. American Export Lines, Inc.*, 132 F. Supp. 129, 136 (S.D.N.Y. 1955). This Court explained that "a carrier does have some obligation to ascertain the dangerous characteristics of the cargo it carries." *Borgships Inc. v. Olin Chemicals Group*, No. 96 Civ. 6734, 1997 WL 124127, at *3 n.2 (S.D.N.Y. March 19, 1997). *See also*, *Southern Pac. Co. v. Walker-Smith Co.*, 257 S.W. 347, 349 (Tex. Civ. App. 1923) ("The law imposes upon owners of ships the duty of using due care to ascertain and consider the particular frailties and character of the goods offered them for shipment, and the exercise of due care in handling such goods"); *Benedict on Admiralty*, Volume 2A, §92 (March 2000) ("The authorities are clear that a carrier is obliged to know the characteristics of the cargo which it accepts for carriage and to afford that cargo the stowage which its characteristics require."); *cf. A/S J. Ludwig Mowinckels Rederi v. Accinanto, Ltd.,* 199 F.2d 134, 141 (4th Cir. 1952) ("carriers should be held to a high degree of care in ascertaining the dangers inherent in cargo that they are handling; but … are not to be held negligent when they seek and follow the advice of expert and experienced agencies such as the Coast Guard, the Fire Department and the Board of Underwriters").

To properly care for the cargoes that they transport, carriers must be expected to know more than a little chemistry. This means that carriers have consistently been held at fault for mismanagement or ignorance of the chemical reaction risks of the cargoes that they have agreed to safely transport. *Anderson*, 160 F.2d at 174 ("cashew nut liquid was corrosive and might cause a dermatitis"); *Verbeeck*, 269 F.2d at 70 (faulting carrier for ignoring Dutch and U.S. safety regulations calling for the covering of naphthalene cargoes); *The Willfaro*, 9 F.2d 622 (9th Cir.

5

1925) (faulting carrier for unventilated stowage of spontaneously combustible fishmeal); *Cornec v. Baltimore and Ohio RR Co.*, 48 F. 2d 497, 501 (4th Cir. 1931) ("The man on the street may not know the dangerous character of carbonaceous dust, but this carrier knew, or should have known it"); *Skibs A/S Gylf v. Hyman Michaels Co.*, 438 F.2d 803, 806 (6th Cir. 1971) ("the ship master acted negligently in applying water to the overheated [cargo of steel] turnings in hold no. 3"); *Levatino Co. v. American President Lines, Ltd.*, 337 F.2d 729, 730 (2d Cir. 1964) (faulting carrier for ignoring freezing temperatures for chestnuts); *Isbrandtsen Co., Inc. v. United States (the Edmund Fanning)*, 201 F.2d 281, 284 (2d Cir. 1953) (carrier at fault for the reaction of potassium chlorate stowed below drums of sulfuric acid); *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465 (5th Cir. 1976) (carrier expected to know about the toxicity of benzene fumes); *Hobart v. Sohio Petroleum Co.*, 376 F.2d 1011 (5th Cir. 1967) (carrier should know about hydrogen sulfide gas emissions from crude oil); *Remington Rand, Inc.,* 132 F. Supp. at 136 (faulting carrier for not protecting cargo from heat sensitivity of scrap film); *Amerada Hess Corp. v. SS Philips Oklahoma*, 558 F. Supp. 1164, 1168 (S.D.N.Y. 1983) (carrier at fault for ignoring the heating requirements for low sulfur waxy residue oil); *cf. A/S J. Ludwig Mowinckels Rederi,* 199 F.2d at 140-141 (approving of carrier's conduct in seeking expert advice regarding the explosion risks of ammonium nitrate fertilizers).

As further explained in the supporting affidavit of Edward J. Kelly, had the Rickmers Interests exercised reasonable care, at least to the extent of industry standards, they would have been fully aware of the Cargo's hydrogen gas and firefighting risks.

**B.   This case is not the paradigm for the typical duty to warn case**

For starters, it should be recognized that the relationship between shippers and carriers is quasi-contractual, heavily regulated and uniquely premised upon the professionalism, experience and knowledge of the carrier.  *See, Martinez,* 529 F.2d at 465 (a warning "is unnecessary where the supplier of the product has 'reason to believe that those who will use it will have such special experience as will enable them to perceive the danger...' [and] DuPont could reasonably anticipate that only professionals familiar with the precautions necessary for safe handling of benzene and similar petrochemical substances would come in contact with or otherwise handle the cargo of the B-29.")  (quoting *Restatement (Second) of Torts,* §388 comment k).   In addition, there is the further factor that maritime law imposes on carriers a strict duty to properly care for the cargoes they transport including, as noted above, a significant inquiry duty.  Finally, it is apparent that the dangers complained about by the Rickmers Interests were not risks that were created spontaneously or independently by the Cargo but occurred as a result of the collision and the seawater flooding the cargoes in Hold No. 1; obviously a serious breach of the duty to properly care for the Cargo. [2]

An evaluation of danger should not be made in isolation, instead, it should recognize that care and danger are opposites sides of the same coin.  *See*, *The Athanasia Comninos* [1990], 1 Lloyd's L. Rep. 277, 282-83 (Mustill, J.) ("Carriage of coal involves hazards greater than those associated with inert goods; but they are hazards which could be overcome if the shipowner had

---

[2]  The statistical evidence in this case establishes that such a flooding event is extremely rare for ships transporting containerized cargoes.  56.1 Stmt. ¶¶110-113.  And, as confirmed by its non-hazardous classification, when properly transported, the Cargo does not have abnormal risks or dangers.  *Id.* ¶¶66-76.

the necessary knowledge, skill and equipment … one can say that proper carriage and 'dangerous' nature are opposite sides of the same coin."); *Cornec*, 48 F.2d at 503 ("Pitch dust, as we have seen, is dangerous just as is any other carbonaceous dust; but … [t]he dust is not a vice of either pitch or grain.  It is stirred up by the manner in which the pitch or grain is handled; and a shipper or manufacturer has the right to assume that a carrier or stevedoring company is familiar with the danger inherit in clouds of carbonaceous dusts and will protect against them accordingly.").

It is also noteworthy that the Claimants have not provided any analysis concerning the "probability and risks" of (their version of) the Casualty.  56.1 Stmt. ¶114.  Such an analysis, which should evaluate the likelihood and forseeability of the underlying casualty events, is a requirement for a maritime failure to warn case.  *See, Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000) (in maritime warning cases "some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary") (quoting *Restatement (Third) of Torts: Products Liability* §2 at cmt. a).

**POINT 2**　　　**The Claimants Cannot Prove that There Was a Breach of Any Duty to Warn**

Even if there was a duty to warn, the Claimants cannot establish that the Rickmers Interests, or their agents, did not receive suitable information regarding the Cargo.  As noted above, and in greater detail in the accompanying 56.1 Stmt. and supporting affidavits, the Rickmers Interests were provided with significant information, on repeated occasions, about the nature and character of the Cargo.  56.1 Stmt ¶¶9-25; 35-59; 77-81.  Moreover, the Rickmers Interests refused to produce witnesses from their office in Xingang, where this Cargo, and prior

shipments, were regularly loaded and the paperwork processed.  They also did not produce any

evidence or witnesses to show the extent of information and knowledge held by their local agent

in Tianjin and/or their stevedores in the loading port of Xingang.  56.1 Stmt. ¶61-65.  This means

that the Claimants will not be able to show that the Rickmers Interests, or their local agents and

stevedores, were not adequately informed and warned.  *See,* Fed. R. Civ. P. 37 ("If a party fails to

provide information . . . the party is not allowed to use that information . . . on a motion, at a

hearing, or at trial, unless the failure was substantially justified or is harmless.").  As a result, they

will never be able to conclusively establish (as is their burden) that the Rickmers Interests, and

their local representatives, were not adequately informed of the Cargo's nature, characteristics,

and risks.  *See, e.g., Martinez*, 529 F.2d at 463 (it was error to hold defendants had failed to

discharge their duty to warn when the only evidence submitted with respect to discharge of the

alleged duty, i.e., the presence or absence of an identification/warning card, was simply

"inconclusive").

**POINT 3       The Claimants Cannot Prove Proximate Causation**

   **A.  The Claimants' fire expert offers only speculation regarding the cause of the
        post-collision explosions and fire onboard Rickmers Genoa**

      Only the Rickmers Interests have designated experts—the Cargo Interests have not—and

the former's expert reports are insufficient to support the Claimants' theory that some of the

Cargo was the cause of the fire and explosions on board Rickmers Genoa.  Moreover, these

shortcomings—which are detailed in the accompanying declaration of Dr. John Bland—are fatal

to their case.  As explained in Dr. Bland's declaration, the Claimants' causation theory is based

upon unreliable speculation and is not supported by suitable calculations or tests.  It is, therefore,

inadmissible under Fed. R. Evid. 702.  *See, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  Accordingly, for the

purposes of this summary judgment motion, ESM Group and ESM Tianjin challenge the

admissibility of the Claimants' expert causation testimony.  *See, Raskin v. Wyatt Co.*, 125 F.3d 55,

66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion

for summary judgment…The court performs the same role at a summary judgment phase as at

trial; an expert's report is not a talisman against summary judgment.").

Under Fed. R. Evid. 702, expert opinion based on scientific, technical or other specialized

knowledge may be presented only if "(1) the testimony is based upon sufficient facts or data, (2)

the testimony is the product of reliable principles and methods, and (3) the witness has applied

the principles and methods reliably to the facts of the case."  Summary judgment is proper,

because the Claimants' expert causation theory fails to meet these criteria.  *See, Brooks v.

Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("The failure to test a theory of causation

can justify a trial court's exclusion of the expert's testimony…. As a result, summary judgment

was properly granted.").

**B.  The Master knew about the risks of magnesium-based cargoes**

Although the Rickmers Interests had not informed the ship's Master—prior to the

Casualty—that his ship was carrying a magnesium-based cargo, Capt. Bielawski testified at his

deposition that he was aware that magnesium, when exposed to seawater, can generate

flammable hydrogen gas.  56.1 Stmt. ¶60.  *See, Ente Nazionale Per L'Energia Electtrica*, 774 F.2d

648, 656-657 (4th Cir. 1985) (failure to warn about coal "fines" and ventilation practices was not

the cause of fire and explosion where Master already knew not to ventilate coal cargoes); *Burke v.

Spartanics*, 252 F.3d 131, 139 (2d Cir. 2001) (where "the risk was well understood by the plaintiff

a warning would have made no difference"); *Martinez*, 529 F.2d at 464 ("There is no right to recover where the party to be warned is already aware of the danger.").

**C. The Rickmers Interests did not provide their stow planners and ship personnel with details or documents regarding containerized cargoes, so further warnings about the Cargo's risks would have made no difference**

The Rickmers Interests did not provide their stow planners and ship personnel with any information about the nature and character of the containerized cargoes that they were transporting. 56.1 Stmt. ¶¶104-109. As a result, they will be unable to show that additional information or warnings would have made any difference in the way they stowed and cared for the Cargo during the Casualty voyage. *Id.* ¶¶94-109. *See, In re M/V DG Harmony,* 533 F.3d at 96 ("the plaintiff must show that the warning, if given, would have impacted stowage.").

**D. After the Collision, the Rickmers Interests' Emergency Response Team ignored the Cargo, so further warnings would have made no difference**

The Rickmers Interests' duty to care for the Cargo, based upon its nature and frailties, is a continuing obligation which certainly did not abate by reason of the collision and/or the flooding of Hold No. 1. Yet, discovery has revealed that after the collision, and during the initial four and a half hours when Hold No. 1 was flooded with seawater, the Rickmers' headquarters-based emergency response team failed to obtain any information about the nature and characteristics of cargoes stowed in particular containers loaded in that hold, or to take steps to minimize the potential hazards resulting from seawater flooding those cargoes. 56.1 Stmt. ¶¶115-128. *See, Schroeder Bros., Inc., v. Saturnia*, 226 F.2d 147, 150 (2d Cir. 1955)(Carrier's duty to care for cargo during delayed voyage was breached when chestnuts became moldy due to the lack of ventilation); *Cook Indus., Inc. v. Barge UM-308*, 622 F.2d 851, 854 (5th Cir. 1980) (Carrier failed to inspect and ventilate soybean cargo during delayed voyage); *Amerada Hess Corp.*, 558 F. Supp.

at 1168 (Carrier was required to care for cargo during delayed voyage based upon nature and characteristics of cargo).

**E.  After-the-fact claims by the Rickmers Interests -- that they would not have transported the Cargo if they were better informed about its risks -- are unrealistic, immaterial and do not satisfy the Second Circuit's causation test**

The Rickmers Interests would like to be able to avoid summary judgment by making the unrealistic assertion that they would not have carried the Cargo had they received a separate Material Safety Data Sheet ("MSDS") statement reciting the Cargo's risks.  *See,* Dillon Aff. Ex. 24. The correct approach to this type of self-serving testimony (which was generated on direct questioning by counsel for the Rickmers Interests) is to treat it as immaterial.  As explained by the court in *Canterbury v. Spence,* 464 F.2d 772, 790-91 (D.C. Cir. 1972), this type of speculation serves only to distract the court from an objective assessment of the true situation.  If these types of easily generated statements were treated as material, it would make resolution of the causation issue hinge on "whether a speculative answer to a hypothetical question is to be credited."  *Id.* Such an approach is particularly inappropriate because these types of assertions will inevitability be presented with a toxic mix of "hindsight and bitterness."  *Id.  See also*, James A. Henderson, Jr. and Aaron D. Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U. L. Rev. 265, 305-10 (1990) (failure to warn cases become highly problematic when a "plaintiff can offer little more than self-serving testimony and anecdotal evidence to establish her proximate causation case . . . and by mere say-so").

Nor is the assertion realistic.  The Rickmers Interests' actual booking and stowage practices show no indication of any prior history of any similar containerized cargoes being rejected for carriage.  56.1 Stmt. ¶¶94-103.  And, even after they had received a MSDS disclosing

various hazards, the Rickmers Interests regularly carried (and continued to carry) cargoes with

greater risks.  For instance, a shipment of ferro silicon (which according to an MSDS supplied to

Rickmers, may evolve hydrogen gas when wet and requires sand or dry firefighting

extinguishants) was carried.  *Id.* at ¶¶82-84; 86-87.  Moreover, in at least one instance, this cargo

was stowed under-deck despite the Rickmers Interests' knowledge of the risks presented, and the

professed limitations of the firefighting systems aboard the Vessel.  *Id.* at ¶85.  In addition, before

the Casualty, cargoes of thiorea dioxide ("TDO") were regularly carried aboard Rickmers' vessels.

The Rickmers Interests were informed, as part of the dangerous goods declaration for these TDO

cargoes that the recommended firefighting method for this product was sand.  *Id.* at ¶88.  All of

these factors clearly indicate that, although the Rickmers Interests had adequate information to

apprise themselves of any risks associated with the Cargo, they deliberately chose to book and

carry it.  *See,* Kelly Affidavit at ¶¶12, 14, 31,32, 35; 56.1 Stmt. ¶¶26-34.

     Finally, the hindsight assertion by the Rickmers Interests -- that they would not have

booked the cargo -- does not address the Second Circuit's causation test.  "The element of

causation is satisfied only if plaintiff goes on to prove that the absent warning, if given, would

have affected the carrier's stowage decision and thus prevented the explosion."  *In re M/V DG*

*Harmony*, 533 F.3d at 97.

**POINT 4**     **The Dangerous Cargo Provisions of COGSA §4(6) Should Be Interpreted So**
              **They Are Consistent with the Later and More Specific Hazardous Material**
              **Transportation Act and the U.S. Dept. of Transportation's Determination that**
              **the Cargo is Not Hazardous**

     The terms of §4(6) of the Carriage of Goods by Sea Act ("COGSA"), Historical Note, 46

U.S.C.  §30701, ("COGSA §4(6)"), referring to goods of an "inflammable, explosive, or

dangerous nature and character," should be interpreted with explicit recognition that Congress

subsequently enacted the Hazardous Materials Transportation Act, 49 U.S.C. §§5101-5127 (the

"HMTA"), which is specifically directed at this topic.  *See also, Chlorine Institute, Inc. v.*

*California Highway Patrol*, 29 F.3d 495, 496 (9th Cir. 1994) (the HMTA was intended "to replace

a patchwork of state and federal laws and regulations concerning the transportation of hazardous

materials 'with a scheme of uniform, national regulations'").  It should also be recognized that

the HTMA was also expressly intended to occupy and preempt the field, and that pursuant to the

HMTA, the extensive and detailed regulations known in the industry as the Hazardous Material

Regulations ("HMR"), 49 C.F.R. §§171-180, were promulgated by the United States Department

of Transportation (the "DOT").  *See,* 49 U.S.C. §5125.  In this regard, the HMTA and HMR take

on paramount importance because federal maritime law "is to be developed, insofar as possible,

to harmonize with the enactments of Congress in the field."  *American Dredging Co. v. Miller*,

510 U.S. 443, 455 (1994); *see also, Somo Japan Ins. Co. of Am. v. Union Pacific R.R. Co.*, 456 F.3d

54, 74 (2d Cir. 2006) ("There is no additional requirement that only those federal statutes that a

court deems 'inherently maritime' can govern the interpretation of a maritime contract.").

Based upon uniformity considerations, the meaning to be given to the dangerous goods

terms of COGSA §4(6) should not be in conflict with the detailed regulatory scheme established

by the HMR and, as a result, this Cargo (which was affirmatively determined not to be hazardous

by the DOT) should not be considered "dangerous" under COGSA §4(6).[3]  56.1 Stmt. ¶¶66-76.

---

[3]  At a minimum, the ruling by the DOT, determining that the Cargo is not hazardous (56.1 Stmt.
¶73) is entitled to substantial deference.  *See, e.g., Freeman v. Burlington Broadcasters, Inc.*, 204
F.3d 311, 322 (2d Cir. 2000) ("An agency's interpretation of an ambiguous statute it is charged with

Moreover, because experts in the field developed them, and shippers and carriers regularly rely upon them, the balance struck by these regulatory standards should be taken into account when the Court is being asked to define the relevant legal standards in maritime litigation.  *See, Westchester Fire Ins. Co. v. Buffalo Housewrecking & Salvage Co.*, 129 F.2d 319, 320 (2d Cir. 1942) (per curiam) ("dangerous goods" liability does not apply to cargo of metal turnings and borings because "the risk of fire is not sufficient to cause the material to be classed as inflammable by the I.C.C. regulations or declined for shipment by steamship companies").

**POINT 5        The Provisions of COGSA §4(6) Grant No Rights to Cargo Interests**

The terms of COGSA extensively regulate the obligations, rights, and immunities of carriers, but none of the terms of COGSA mention claims between cargo interests *inter se*. Section 4 of COSGA is entitled "Rights and Immunities of Carrier and Ship."  It grants the carrier certain rights against the shippers of cargoes transported on its ships.  But, the rights against shippers created by §4 do not extend to the cargo interests in this case.  In this regard, it should be noted that the Second Circuit's decision in *DG Harmony,* expressly did not decide "whether third-parties may bring claims under COGSA."  533 F.3d at 93.  The Court did, however, decide that, to the extent the cargo interests had a right to recover, they must suffer under the same limitations as the shipowner.  *Id.* at 94.

---

administering is entitled to Chevron deference not only when the agency interprets through rulemaking, but also when it interprets through adjudication."); *Tennessee v. U.S. Dept. of Transp.*, 326 F.3d 729, 734 (6th Cir. 2003) ("Chevron deference" must be afforded by reviewing courts to adjudicatory decisions by the DOT).  In short, the Cargo, which has been determined not to be dangerous under the HMR, should also be treated as not dangerous within the meaning of COGSA.

COGSA should be interpreted in accordance with its plain terms.  Thus, the Supreme Court has previously declined to extend COGSA  to claims which are not explicitly within its terms.  *See, Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 302 (1959) ("Congress, while limiting the amount of liability of the carrier (and) the ship did not even refer to stevedores or agents of a carrier.  We can only conclude that if Congress had intended to make such an inroad on the rights of claimants (against negligent agents) it would have said so in unambiguous terms and in the absence of a clear Congressional policy to that end, we cannot go so far.") (internal quotations omitted).

In addition, there is no symmetry between the rights and obligations of cargo interests *inter se* and those of a carrier *vis-à-vis* a shipper, nor is there any legal principle which would require that the Cargo Interests have the same rights as shipowning interests.  *See, e.g., Sinram v. Pennsylvania R. Co.*, 61 F.2d 767, 770-71 (2d Cir. 1932) (L. Hand) (Under Palsgraf's duty analysis, colliding tug owed a duty to barge's owner but not to the cargo interests whose cargo was loaded into the damaged barge).

**POINT 6      The Veil Piercing Claims Alleged Against ESM Group Require Proof of Fraud, or Something Akin to Fraud, Which Is Not Present in this Case**

This Court's March 2009 decision, *In re Rickmers Genoa Litigation*, 622 F. Supp. 2d 56, 75-76 (S.D.N.Y. 2009), relied upon a fifteen-factor test when granting the Claimants permission to plead veil piercing claims against ESM Group.  That ruling appears to be based upon the statement of the law in *N. Tanker (Cyprus) Ltd. v. Backstrom*, 967 F. Supp. 1391, 1401-02 (D. Conn. 1997), and the suggestion in *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008), that no "firm rule" veil piercing has been established.  However, as further explained

below, *Backstrom* improperly discounts, and *Williamson* does not consider, the more rigorous

standard of proof which was established as the governing law in several prior Second Circuit

decisions.[4]

A careful examination of Second Circuit maritime cases concerning veil piercing

confirms that several decisions which expressly require "fraud or something akin to fraud" as an

essential element have never been overruled.  That same careful examination also reveals that the

Second Circuit cases which have suggested a more flexible standard have never actually ruled that

the corporate veil could be pierced without proof of something akin to fraud.

Fraud, or something akin to fraud, which is not alleged or present in this case, 56.1 Stmt.

¶136, was specifically found to be a required element in the following maritime veil piercing cases

decided by the Second Circuit: *Interocean Shipping Co. v. National Shipping and Trading Corp.*,

523 F.2d 527, 539 (2d Cir. 1975) ("there is no evidence in the record before us that such control

was used to perpetrate a fraud or something akin to fraud"); *Ope Shipping, Ltd. v. Allstate Ins.*

*Co.*, 687 F.2d 639, 642 (2d Cir. 1982) ("In the absence of a finding that such fraud or

misrepresentation was perpetrated on the defendants as would make it inequitable to hold them

---

[4]  It should also be noted that the *Backstrom* standard is open to criticism because it incorrectly assumed that prior Second Circuit precedents were overruled, *sub silentio*, by later decisions which contain statements concerning the maritime veil piercing doctrine but do not discuss the Second Circuit's earlier and controlling precedents.  Quite simply, that is not the applicable law. *See, In re Sokolowki*, 205 F.3d 532, 534-35 (2d Cir, 2000) ("As we have explained, '[t]his court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*.'") (citing cases).  Moreover, the test suggested in *Backstrom* also does not suitably tie veil piercing claims to actual wrongdoing. Instead, *Backstrom* and its multi-factor test would permit plaintiffs to hold corporate parents hostage in a case notwithstanding the absence of the type of wrongdoing ultimately required to prevail at trial.

to the terms of their contracts, the district court should not have disregarded the corporate existence."); and *Fisser v. International Bank*, 282 F.2d 231 (2d Cir. 1960) (*"Such control must have been used by the defendant to commit fraud or worse,* to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights.") (emphasis added).

In *Kirno Hill Corp. v. Holt,* 618 F.2d 982 (2d Cir. 1980), the Second Circuit stated that the test for veil piercing requires proof of (i) having used the corporation to perpetrate a fraud *or* (ii) having so dominated and disregarded the corporate form that the alleged subservient corporation transacted the business of the dominant corporation rather than its own.  618 F.2d at 985.  However, although it stated the test using the word "or" (rather than "and"), *Kirno Hill* also expressly found that there was no evidence that the corporate entity had been used to perpetrate a fraud.  *Id.* at 985.  And, in *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43 (2d Cir. 2008), the court, although referring to a multi-factor test for veil piercing, also highlighted the importance of this element by stating that "the general principle guiding courts in determining whether to pierce the corporate veil 'has been that liability is imposed when doing so would achieve an equitable result.'" (quoting *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 601 (2d Cir. 1989) (applying New York law)).

Notably, the Second Circuit has never actually ruled that a defendant's corporate veil could be pierced based purely on evidence of domination, i.e., without proof of something akin to fraud.  For instance, in *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986), even though the decision states the test without specifying that fraud was a

required element, the court noted that the district court had found that the defendant, Gatlin, had treated Rascator (the corporate entity), as his alter ego and had "used the corporation for fraudulent purposes." *Id.*

In tracing the source of the seemingly more liberal standard in Second Circuit maritime veil piercing cases, the *Kirno Hill* decision stands out. *Kirno Hill* relies upon three prior Second Circuit decisions as support for its statement of the veil piercing test: *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979); *Interocean Shipping Co. v. Nat'l Shipping and Trading Corp.*, 523 F.2d 527, 529 (2d Cir. 1975); and *Williams v. McAllister Bros. Inc.*, 534 F.2d 19, 21 (2d Cir. 1976). Two of the foregoing three cases explicitly stated that the test for piercing the corporate veil under federal maritime law required proof of fraud or something akin to fraud. In both cases, the Second Circuit separately addressed the "fraud" requirement in holding that a maritime plaintiff needed to prove domination *and* fraud or something akin to fraud for a veil piercing claim.

In *Interocean Shipping,* the court held that proof that control was "used to perpetrate a fraud or something akin to fraud" was a "*sine qua non*" for veil piercing. 523 F.2d at 539. Similarly, in *Williams,* the Second Circuit again held that to succeed on a piercing claim, the plaintiff must prove a "two-step argument:" first, a level of domination such that the alleged subservient corporation is a mere instrumentality of the dominant corporation and has no existence of its own *and* second, that the corporate existence has been used to perpetrate a fraud resulting in an unjust loss to the claimant. 543 F.2d at 21. Finally, *Gartner,* which was a diversity rather than a maritime case, stated the test for piercing under New York law as requiring *either* domination *or* use of the corporation to perpetrate a fraud. But, as is true with all of these veil

piercing cases, *Gartner* specifically addressed the fraud issue, and the court made a specific finding that there was no evidence that the corporate form had been used to accomplish a fraud. [5] 607 F.2d at 586.

**POINT 7**      **The Veil Piercing Claims Alleged Against ESM Group Require Proof of Proximate Cause Which Is Not Present in this Case**

The Claimants' veil piecing claims overlook the requirement for causation. As clearly stated in *Fisser*, the alleged control "must proximately cause the injury or unjust loss complained of." 282 F.2d at 238. In this case, there is simply no evidence that any alleged dominating activity by ESM Group caused ESM Tianjin to handle this shipment differently. There is also no evidence that the alleged domination by ESM Group caused ESM Tianjin to omit any warnings. 56.1 Stmt. ¶137. *See*, *Cordius Trust v. Kummerfield*, No. 04-2722, 153 Fed. Appx. 761, 763 (2d Cir. Oct. 4, 2005) ("Cordius has not yet demonstrated, however, that Kummerfield used his domination of KAI to cause either of these wrongs"); *Bedford Affiliates v. Sills,* 156 F.3d 416, 431 (2d Cir. 1998) ("the trial court [erroneously] made no findings on the second element of the veil piercing analysis-namely that Stills' domination led to the Site's contamination").

---

[5] *Gartner* is one of several Second Circuit cases to have misstated the requirements for piercing under the law of New York. *See generally, Thrift Drug, Inc. v. Universal Prescription Administrators*, 131 F.3d 95, 97 (2d Cir. 1997) (acknowledging the error in *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club, Int'l, Inc.,* 2 F.3d 24, 26 (2d Cir. 1993), which had mistakenly suggested that New York allows piercing either "to prevent fraud or other wrong, *or* where a parent dominates and controls a subsidiary.") *(*Emphasis added*). Thrift Drug* correctly stated that the New York test, as set forth in *Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 623 N.E.2d 1157 (1993), requires "(1) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." 131 F. 3d at 97 (emphasis in original).

**POINT 8**        **The Agency Theory Claims Alleged Against ESM Group Cannot Create**
**Vicarious Liability Because ESM Tianjin Made Its Sales and Shipment**
**Decisions Independently and Without Control by ESM Group**

This Court's prior ruling recognized that ESM Tianjin and ESM Group had entered into a

CIF sale agreement.  622 F. Supp. 2d at 74.  In addition, the documents and deposition testimony

confirm that there was no express agency contract and that an agency relationship was not

intended between ESM Group and ESM Tianjin.  56.1 Stmt. ¶139.  There has been no allegation

by the Claimants that ESM Group created "apparent authority" for ESM Tianjin.  And, in any

event,  ESM Group had no prior direct dealings with any of the Claimants, and there could not

have been any representations by ESM Group or reliance by the Claimants.  56.1 Stmt. ¶140.

"[A]pparent authority to do an act is created as to a third person by written or spoken words or

any other conduct of the principal which, reasonably interpreted, causes the third person to

believe that the principal consents to have the act done on his behalf by the person purporting to

act for him."  Restatement (Second) of Agency §27.  *See also, Fletcher v. Atex, Inc.,* 68 F.3d 1451,

1462 (2d Cir. 1995) ("Key to the creation of apparent authority…is that the third person,

accepting the appearance of authority as true, relied upon it." (quoting, *Greene v. Hellman*, 51

N.Y.2d 197, 204 (1980)).

This Court, however, has previously found that neither the parties' intent nor a

contractual disclaimer of an agency relationship is dispositive for purposes of determining

whether an agency relationship exists.  622 F. Supp. 2d at 74, citing Restatement (Second) of

Agency §1 cmt. b.  As a result, the Court left open the possibility that, despite the intention of the

parties and the lack of an express agreement making ESM Tianjin the agent of ESM Group, an

agency relationship might nevertheless be found to exist as a matter of law.  *Id.*  The Court

therefore granted Claimants leave to plead their allegations with respect to alleged agency and vicarious liability.

Since the Court decided ESM Group's prior motion for summary judgment, the Claimants have plead their agency-based claims and there has been additional discovery of documents from ESM Group and ESM Tianjin which bear on their relationship.  56.1 Stmt. ¶142.  On the existing record, *id.* ¶¶142-144, there is no factual allegation or evidence that ESM Group had the *requisite degree* of "control" needed to establish an agency-based vicarious liability.  *See, Maung Ng We v. Merrill Lynch & Co.*, No. 99-CV-9687, 2000 WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000) ("The essence of control in an agency sense is in the *necessity* of the consent of the principal on a given matter.  Otherwise, if the subsidiary has discretion to act, the parent cannot justifiably be said to have the essential right of control over its subsidiary's actions.") (emphasis in original).  As noted in the 56.1 Statement., ESM Tianjin retained significant discretion to act with respect to this CIF sale transaction including the right to select the carrier and make all shipping arrangements and the right to set the price for the sale. [6]  56.1 Stmt. ¶¶142-144.  As a

_____

[6]  The counts of the amended complaints of the Claimants premised on an agency theory contain nothing more than bare unsupported and conclusory allegations of control, and have not stated sufficient facts to establish that ESM Group exercised a principal's control over ESM Tianjin with respect to the particular transaction at issue.  *See,* Second Amended Third-Party Complaint of Rickmers, ¶52 ("ESM continues to control the manner in which ESM Tianjin operates."); Seventh Amended Complaint of Chem One Plaintiffs, ¶54 ("At all material times ESMG controlled and continues to control the manner in which ESMT operates."); Third Amended Complaint of St Paul Travelers, ¶54 ("At all material times ESMG controlled and continues to control the manner in which ESMT operates.").  Pleadings which offer only labels, conclusory allegations or simple formulaic recitals of the elements of a cause of action should be "stripped away".  *See, Brandon v. The City of N.Y.*, No. 07 Civ. 8789, 2010 WL 1375207, at *3 (S.D.N.Y. March 30, 2010) (quoting, *Ashcroft v. Iqbal*, 550 U.S. 544, 555 (2009)).

result, applying the law as stated in *Maung Ng We*, the relationship between ESM Group and

ESM Tianjin does not meet the requirements for imposing vicarious liability based upon an

agency theory.  This result becomes ever more compelling where, as herein, the agency

allegations are merely a "back door" attempt at a failed veil piercing claim, as applied to a

parent/subsidiary relationship.

It should also be noted, that the mere attachment of the label "agent" does not necessarily

support a theory of vicarious liability.  For example, an independent contractor that undertakes

work on behalf of a party is still an "agent" of that party.  S*ee,* Restatement (Second) of Agency

§14 N, comment a ("'independent contractor' is a term which is antithetical to the word 'servant',

although not the word 'agent.'")  But in this type of agency relation, even though the work is on

behalf of the employer/principal and subject to some measure of control, there is no vicarious

liability.  This is because the principal/employer "[h]as a say-so only about whether the end

product is acceptable, not about the exact manner or means used to achieve it."  *Id.*  D.B. Dobbs,

*The Law of Torts,* §336 at 917 (2001).

As *Maung Ng We* makes clear, the touchstone for determining whether vicarious liability

can be imposed in the context of a parent/subsidiary corporate relationship is determining

whether the subsidiary retains discretion to act and, if it does, as ESM Tianjin did here, vicarious

liability on an agency theory cannot be imposed as a matter of law.

**POINT 9**      **The Rickmers Interests' Indemnity Claims Alleged Against ESM Tianjin Have No Factual or Legal Basis**

**A. There was no indemnity agreement for the Casualty Voyage**

Contrary to the allegations of the Rickmers Interests' third-party complaint, ESM Tianjin did not book the cargo on an indemnity basis, 56.1 Stmt. ¶¶145-151, and did not breach any indemnity agreement. *Id.* ¶152.

**B. This Court's prior rulings dispose of nearly all the indemnity claims based upon the bills of lading**

This Court has already decided that the Rickmers Interests have no contractual right of indemnification as against ESM Group under the terms and conditions of either the Rickmers/Pudong Trans bill of lading or the Pudong Trans/ESM Tianjin bill of lading because ESM Group was not a party to either bill. 56.1 Stmt. ¶129-130. The same lack of privity rationale applies with equal force to ESM Tianjin, at least insofar as the Rickmers/Pudong Trans bill of lading is concerned. ESM Tianjin was not a party to the Rickmers/Pudong Trans bill of lading. 56.1 Stmt. ¶131. Under principles articulated in *Norfolk Southern Railway Co. v. Kirby*, 543 U. S. 14 (2004), ESM Tianjin may be bound by *limitations* provisions in the Rickmers/Pudong Trans bill, but no further. ESM Tianjin did not consent to be bound by terms and conditions in the Rickmers/Pudong bill imposing an affirmative contractual obligation on ESM Tianjin to indemnify the Rickmers Interests for breach of a duty to warn.[7] *See,* 56.1 Stmt. ¶129.

---

[7] As noted in ESM Group's Letter Brief dated January 22, 2009, at pp. 8-9, which was submitted to the Court in support of ESM Group's prior motion for summary judgment, *Royal & Sun Alliance Ins. PLC v. Ocean World Lines, Inc.,* 572 F. Supp. 2d 379 (S.D.N.Y. 2008), rejected the argument that a shipper should be bound, on an agency theory, to *all* the terms and conditions of an NVOCC's contract with the carrier, i.e. the Rickmers/Pudong bill of lading. The court relied upon the Supreme Court's decision in *Kirby*, 543 U. S. at 33. It also recognized, just as with the situation

This leaves the question of whether ESM Tianjin can be held liable to contractually indemnify the Rickmers Interests on the basis of the terms and conditions of the Pudong Trans/ESM Tianjin bill of lading.  But, as demonstrated below, the dangerous goods indemnity provision of the Pudong Trans/ESM Tianjin bill of lading was never breached, and, in any event, the Rickmers Interests cannot benefit from it.

### C.  The "Dangerous Goods Indemnity" in the bill of lading issued by Pudong Trans applies only to goods classified as dangerous under National Law and International Regulations

The Rickmers Interests have previously argued that their indemnity claim can be based upon paragraph 6 of the Pudong Trans bill of lading which is entitled "Dangerous Goods Indemnity."  A copy of paragraph 6 of the Pudong Trans bill of lading is attached as Exhibit 27 to the Dillon Affidavit.  Clause (1) of that paragraph sets forth the basis of the indemnity by referring explicitly to "the rules which are mandatory according to the National Law or by reason of International Convention relating to the carriage of Goods of a dangerous nature …."  Thus, the phrase in paragraph 6 referring to "Goods of a dangerous nature" should be read by reference to "mandatory" national and international law.  And, importantly, there is also no language in paragraph 6 which clearly and unambiguously calls for an indemnity to apply to goods which, under national law and international regulations, are not classified as "dangerous goods."  Given the strict interpretive rules applicable to bill of lading terms, and also to indemnity provisions, the "Dangerous Goods Indemnity" in the Pudong Trans bill of lading cannot reasonably be

---

here, that the matter before it "involve[d] *two* bills of lading," 572 F. Supp. 2d at 392, and that the exporting shipper (White Horse) had not directly entered into a contract with the shipowning interests (Yang Ming, or VOCC).

interpreted to apply to the Cargo which has been determined, by experts in the field, not to be

classed as hazardous.[8]

### D. The Rickmers Interests cannot occupy a better position than Pudong Trans which, by default, has admitted that neither ESM Group nor ESM Tianjin caused or contributed to the Casualty

Pudong Trans' defaults in answering the cross-claims of ESM Group and ESM Tianjin

have the effect of barring any claim based upon the Pudong Trans' bill of lading.  56.1 Stmt.

¶¶132-135.  *See, Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981) ("at inquest after

default, court should accept 'as true all of the factual allegations of the complaint, except those

relating to damages'"); *Geddes v. United Fin. Group,* 559 F.2d 557, 560 (9th Cir. 1977) (noting the

general rule of law that, upon default, the factual allegations of the complaint, except those

relating to the amount of damages, will be taken as true); *Tr. of the Plumbers Local Union No. 1

Welfare Fund v. Dan Yant, Inc.*, No. 06 Civ. 173, 2007 WL 3036759 (E.D.N.Y. Oct. 16, 2007)

("When a party is found to be in default, the court must accept as true all well-pleaded allegations

in the complaint, except those pertaining to the amount of damages.").

---

[8] The Rickmers Interests cannot claim the benefit of any ambiguity regarding the meaning of the term "dangerous."  It has long been the rule that "bills of lading are contracts of adhesion [and] ambiguities in [them] must be resolved against the carrier…."  *Mitsui & Co. v. Am. Export Lines, Inc.*, 636 F.2d 807, 822-23 (2d Cir. 1981).  As noted by the Second Circuit in *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 643 (2d Cir. 1991), clauses "printed on the back of a form bill of lading 'carr[y] little weight toward establishing intent, being [ ] unilateral, self-serving declaration[s] by the carrier which w[ere] not negotiated by the parties and could scarcely be discerned by the unaided eye in the maze of microscopic and virtually illegible provisions on the back[ ] of the bill [ ] of lading'" (quoting *Matsushita Elec. Corp. v. S.S. Aegis Spirit*, 414 F. Supp. 894, 906, n.52 (W.D. Wash. 1976)).  These same considerations also restrain the interpretation of contractual indemnity terms.  See, *Navieros Oceanikos, S.A. v. S.T. Mobil Trader,* 554 F.2d 43, 47 (2d Cir. 1977) (ambiguities in indemnity clauses must be construed strictly against the party seeking indemnity).

In addition, Pudong Trans' default – by which it admitted that neither ESM Group nor ESM Tianjin caused or contributed to the casualty – similarly binds the Rickmers Interests, when they attempt to assert third-party beneficiary rights under Pudong Trans' bill of lading. *BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 697 (2d Cir. 1993); *Barnum v. Millbrook Care Ltd. P'ship,* 850 F. Supp. 1227, 1234 (S.D.N.Y. 1994); *Wolf v. Fed. Republic of Germany*, No. 93 Civ. 7499, 1995 WL 263471, at * 15 (N.D. Ill. May 1, 1995). This is because the third-party beneficiary is said to "step into the shoes of the promisee." *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 313 (2d Cir. 1990). And, a third-party beneficiary's claim is always subject to defenses based upon the contracting party's breach of its contractual duties. *See,* 13 Richard A. Lord, *Williston on Contracts* §37:55 (4th ed. 2000); *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.,* 138 F.3d 160, 166 (5th Cir. 1998). *See also, BAII Banking Corp.*, 985 F.2d at 697, citing *Dunning v. Leavitt,* 85 N.Y. 30, 35 (1881) ("it would be contrary to justice or good sense to hold that [a third party beneficiary] … should acquire a better right against the promisor than the promisee himself had").

**E.  The faults of the Rickmers Interests make indemnity improper**

Due to the faults of the Rickmers Interests in relation to the Casualty, 56.1 Stmt. ¶¶153-154, indemnity is not properly recoverable under settled legal principles. *See*, *Gordon H. Mooney Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 625 (2d Cir. 1980) ("because Export's negligence contributed to the loss, Export cannot obtain indemnity from Maislin"); *Capoziello v. Brasileiro*, 443 F.2d 1155, 1157 (2d Cir. 1971) (indemnity to cover a party's "own negligence" is disfavored);

*see also*, *In re M/V DG Harmony*, 436 F. Supp. 2d 660, 668-70 (S.D.N.Y. 2006) (no tort, statutory

or contractual indemnity for settlement payments). [9]

**POINT 10**     **The Economic Loss Rule Bars the Claims By Certain of the Cargo Interests to Recover Additional Freight and Salvage Expenses Attributable to Undamaged Cargo**

Certain cargo interests, whose cargo was not damaged, have asserted claims for additional

freight and salvage expenses.  56.1 Stmt. ¶155-157.  But, under maritime law, it is clear that

defendants owe no duty in tort to avoid causing unintentional financial harms to plaintiffs who

suffer no physical injury to their person or property.  *Robins Dry Dock* & *Repair Co. v. Flint,* 275

U.S. 303 (1927); *Gas Natural SDG S.A. v. United States*, No. 07-2129, 2008 WL 4643944, at *1,

2008 A.M.C. 2992, 2993 (2d Cir. Oct. 21, 2008) ("there exists a bright line rule barring recovery

---

[9]  The Court should not be concerned with deciding the percentage of fault of the other vessel in the collision.  The collision and subsequent fire/explosions are separate events, and they did not cause an indivisible injury to Rickmers Genoa.  Rather, the injuries from the collision are divisible from the injuries resulting from the subsequent fire/explosions.  In fact, the monetary difference between the collision damage and the damage due to the fire/explosions has been allocated, identified, and calculated by a repair expert for the Rickmers Interests.  Thus, with respect to the claims in this case, there is no basis for the Sun Cross Interests to be treated as joint tort-feasors with either ESM Group or ESM Tianjin.  *See*, *Ravo v. Rogatnick,* 70 N.Y.2d 305, 310, 514 N.E.2d 1104, 1006 (1987) ("[w]here multiple tort-feasors 'neither act in concert nor contribute concurrently to the same wrong, they are not joint tort-feasors; rather their wrongs are independent and successive"); *Bell Petroleum Svcs. Inc. v. Sequa Corp.*, 3 F.3d 889, 895-96 (5th Cir. 1993) (explaining the basis for an apportionment analysis of divisible harms and noting that the issue is a question of law); D.B. Dobbs, The Law of Torts, §174 at 422 (2001) ("When two or more tort-feasors cause separate harms to the plaintiff, as where one negligently injures her arm and another negligently injures her leg, each tortfeasor is normally liable for the harm he caused, no more."); *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260, n.8 (1979) (explaining that joint liability principles "are inapplicable where the injury is divisible and the causation of each part can be separately assigned to each tort feasor,"); *see also*, *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 76 (2d Cir. 2001) (approving a district court ruling that "imposed joint and several liability only after concluding that-as between Blue Ocean and Mill-'the record d[id] not permit a fair allocation of comparative fault.'").

for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a propriety interest"); *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50, 52-54 (1st Cir. 1985) (Breyer, J.) (plaintiffs suffering purely economic harm are "'outside the scope' of those to whom defendant owes a legal duty of care."); *Louisiana ex rel. Guste* v. *M/V Testbank,* 752 F.2d 1019, 1028-29 (5th Cir. 1985) (*en banc*) (the rule's pragmatic limits and virtuous predictability are vital in the maritime context because they dramatically reduce insurance costs).

The economic loss rule is a "bright line" test that applies not only when a defendant negligently interferes with plaintiff's contractual relationships with third parties, but also more generally to any unintentional maritime tort. *Barber Lines,* 764 F.2d at 51-57 (providing numerous reasons for continuing the bright line application of the economic loss rule and explaining that Robins did not "turn so much on the existence of a formal contract as on the existence of limitations upon tort recovery for financial injury"); *M/V Testbank*, 752 F.2d at 1020-27 (holding that "*Robins Dry Dock* represents more than a limit on recovery for interference with contractual rights" and applying the "bright line rule" as a "necessary limitation" in cases of "unintentional maritime tort"); *In re Moran Enters. Corp.,* 77 F. Supp. 2d 334, 338 (E.D.N.Y. 1999) (explaining that the Second Circuit and other district courts in this circuit have "reaffirmed the 'bright line' interpretation of *Robins").* The rule applies not only to maritime negligence actions but also to maritime products liability claims. *East River S.S. Corp.*

*v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871-72 (1986); *see also, Restatement (Third) of Torts: Products Liability* §21 & cmt. a (1998).[10]

Certain cases involving maritime collisions have allowed cargo interests to recover their expenses from the noncarrying ship, even though the cargo suffered no physical damage. *See, Aktieselskabet Cuzco v. The Sucarseco (The Toluma)*, 294 U.S. 394, 404-05 (1935); *Amoco Transp. Co. v. S/S Mason Lykes,* 768 F.2d 659, 667-68 (5th Cir. 1985); *Conti Corso Schiffahrts-Gmbh & Co. KG NR v. M/V Pinar Kaptanoglu,* 414 F. Supp. 2d 443, 449 (S.D.N.Y. 2006). The rationale for that exception is that, at the time of the collision, there is a common venture and contractual sharing arrangement which results in an equitable transfer of the shipowner's costs to the cargo interests. *See, The Toluma*, 294 U.S. at 404-05 (holding that economic loss doctrine did not apply and cargo owners could recover damages from the noncarrying vessel for general average contributions made by the cargo owners based on the "Jason" clause in their bills of lading); *Mason Lykes*, 768 F.2d at 667-68 (cargo interests entitled to recover from the non-carrying vessel the non-refundable "earned freight" they paid for the abandoned voyage of the carrying vessel).

But, the common venture exception to the economic loss rule has only been applied in favor of cargo interests against non-carrying vessels in collision cases, and ESM Group and ESM Tianjin are not the equivalent of a non-carrying vessel. *See, Cargill, Inc. v. Doxford & Sunderland*

---

[10]  This district has consistently applied the economic loss rule as a bright line test. *See, e.g., Plaza Marine, Inc. v. Exxon Corp.,* 814 F. Supp. 334, 335 (S.D.N.Y. 1993); *Allders Int'l (Ships) Ltd.* v. *United States,* No. 94 Civ. 5689, 1995 WL 251571, at * 1 (S.D.N.Y. Apr. 28, 1995) (Martin, J.); *Brown v. Royal Caribbean Cruises, Ltd.,* Nos. 99 Civ. 2435 & 99 Civ. 11774, 2000 WL 34449703, at *5 (S.D.N.Y. Aug. 24, 2000) (Wood, J.); *see also Moran Enters.,* 77 F. Supp. 2d at 339-40 (explaining that the Second Circuit and other district courts in this circuit have "reaffirmed the 'bright line' interpretation of *Robins*").

*Ltd. (Cargill II)*, 785 F.2d 1296, 1297 (5th Cir. 1986) (noting that "the traditional [common venture] rule" had yet to be "extended to non-collision cases," and declining to extend it to cases where the alleged negligent act did not take place during the common venture voyage).  In this case, the alleged failure to warn occurred significantly before the Cargo was loaded onto Rickmers Genoa, just like the defective engine repair in *Cargill II*.  Therefore, the owners of the salved and physically undamaged cargo cannot claim an entitlement to recover their economic losses based on a common venture theory.  *Id.*

It must also be recognized that in *The Toluma,* and *Mason Lykes,* the recoverable economic expenses in those cases were really losses that initially fell upon the shipowners but had been shifted (by contractual terms and/or the general average adjustment) to cargo interests.  This transferred cost factor was identified as an important consideration in the *Mason Lykes* decision.  768 F.2d at 668.  As the court explained, cargo interests' loading expenses in the *Toluma,* and the freight expenses in the *Mason Lykes,* were transferred expenses which gave the cargo interests rights equivalent to "equitable subrogation."  This was because the parties' agreements had "contractually shift[ed] the risk of economic loss, which would normally fall upon the property owner, to a third party."  *Id.*

In this case, the salvage expenses claimed by certain of the Cargo Interests were never the liability of the Rickmers Interests and were never shifted or transferred.  *See, Georgia Co. v. Richfield Oil Co.*, 50 F.2d 901, 902 (W.D.Wash. 1930) ("A ship is not liable for the proportion of salvage due from her cargo.") (citing cases).  And, unlike the circumstances in the *Mason Lykes,* there was no wrongful abandonment of the voyage.  See, *Mason Lykes,* 768 F.2d at 669.  Rather,

31

the additional freight expenses were incurred because certain of the Cargo Interests were unwilling to wait for the Rickmers Interests to transport their cargoes to destination.  56.1 Stmt. ¶156.  These claims, for a voluntary and additional expense, are certainly not of the same type of "damage" as the unreturned "earned" freight claims in the *Mason Lykes*.  In short, neither the salvage expenses nor the additional freight expenses are the same type of transferred shifted or subrogation expenses found recoverable in the *Toluma* and *Mason Lykes*.

The Cargo Interests pursuing these claims for salvage and additional freight expenses have also suggested that there should be an exception to the economic loss rule for costs of preventing or mitigating a potential physical loss.  But, several decisions have previously rejected, on economic loss grounds, claims for mitigation costs spent to prevent an imminent physical loss.  For example, in *Cargill, Inc. v. Doxford* & *Sunderland, Ltd. (Cargill I)*, 782 F.2d 496 (5th Cir. 1986), the court barred recovery of all the cargo owner's losses caused by the defendant's negligent engine repair, including the cargo owner's mitigation costs of "remov[ing] the perishable grain from the ship rather than leav[ing] it to deteriorate while the engine was being repaired." *Id.* at 497-98.

In *In re Moran Enters. Corp.,* 77 F. Supp. 2d 334, 336 (E.D.N.Y. 1999), the plaintiff utility company spent over $5 million to prevent a voltage collapse and damage to its electrical grid resulting when the defendant's barge dropped its anchor and severed a submarine electric cable. Nevertheless, the court explained that if the utility company had no proprietary interest in the severed cable, its emergency prevention costs represented "the type of economic damage loss that any interpretation of *Robins Dry Dock* and its progeny in this Circuit has specifically barred." *Id.*

32

The court therefore held that, absent proof of actual damage to the utility's proprietary interest, "*Robins* will apply and bar recovery of the approximate $5 million in damages associated with the prevention of the voltage collapse." *Id*. at 340.

Likewise, in *Barber Lines*, the defendant's negligence forced the plaintiff to discharge its cargo at another pier and to incur significant extra labor, fuel, transportation, and docking costs; yet the court held that those significant added expenses, like certain of the Cargo Interests' freight and salvage-related expenses in this case, were financial harms subject to the economic loss rule. 764 F.2d at 51-52.

In addition, the economic loss rule applies on a claim-by-claim basis. It allows only those claims that have a "direct tie to the plaintiff's specific physical loss or damage." *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.,* 71 F.3d 198, 202-03 (5th Cir. 1995) (barring plaintiff's claims because its "economic loss was not 'attendant' to the physical damage" to its proprietary interest); *Icelandic Coast Guard v. United Techs. Corp.,* 722 F. Supp. 942, 948 (D. Conn. 1989) (allowing claims that were "attributable to and [we ]re inextricably tied to the injuries to the crewmen" but granting summary judgment on claims unrelated to those personal injuries).

This case exemplifies the policy considerations that support the rule. One of those justifications is the idea that insurance, not tort damages, is the best way to address economic losses arising from unintentional maritime torts, because of the possibility of endless multiplication of claims for economic damages and the existence of a robust maritime-insurance system. *See, Getty Ref. & Mktg. Co. v. MT Fadi B,* 766 F.2d 829, 832 (3d Cir. 1985) ("The policy against recovery based on negligence is rooted at least in part on ... the 'pragmatic' objection, that

while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance."). (citation omitted).

Because economic losses like those alleged in this matter are usually covered by insurance, the most desirable characteristic of a legal rule to govern such claims is certainty.  If parties know who bears what risks, insurers can adjust coverages and premiums accordingly. Because economic losses in the form of salvage expenses can be, usually are, and in this case actually were, covered by insurance, it makes perfect sense to permit them to continue to be subject to the bright line economic loss rule.  *See, East River,* 476 U.S. at 871 (refusing to allow recovery for foreseeable economic losses caused by a defective maritime product because, *inter alia,* "[l]osses like these can be insured").

**CONCLUSION**

For all foregoing reasons, summary judgment should be granted dismissing all the claims

asserted against ESM Group and ESM Tianjin in these consolidated actions.

Date:      New York, New York
           April 16, 2010

                              BURKE & PARSONS
                              Attorneys for Defendant
                              ESM Group Inc. and ESM (Tianjin) Co. Ltd.

                              By    /s/ Christopher H. Dillon
                                    Christopher H. Dillon
                                    100 Park Avenue
                                    New York NY  10017-5533
                                    (212) 354-3800

Of Counsel: Michael J. Walsh
                  Hae Woen Grace Bae